IN THE UNITED STATES DISTRICT COURT
FOR THE DISTRICT OF NEBRASKA

| | |
|---|---|
| UNITED STATES OF AMERICA, | |
| Plaintiff, | 8:21CR152 |
| vs. | GOVERNMENT'S RESPONSE TO DEFENDANT'S MOTION TO SUPPRESS |
| JOSE RAMON CISNEROS PEREZ, | |
| Defendant. | |

COMES NOW Kelli L Ceraolo, Assistant United States Attorney, on behalf of the United States of America, and states the following in opposition to the defendant's motion to suppress, Filing No. 29:

**Facts**

Officers with the Douglas County Sheriff's Office ("DCSO") and FBI Child Exploitation and Human Trafficking Task Force ("CEHTTF") began investigating after the father of a ten-year-old girl made a report to law enforcement and turned his daughter's cell phone over to the Kansas City Police Department in February 2020. Investigators determined that someone in Omaha, Nebraska, had begun chatting with the child via the phone application "Likee" and then continued communicating with the child on Instagram, using a "Rock Paper Scissors" game to cause the child to send nude and explicit videos of herself.

On December 9, 2020, members of DCSO and the CEHTTF executed a search warrant at twenty-year-old Defendant Jose Ramon Cisneros Perez's residence in Omaha, Nebraska. Douglas County Sheriff's Deputies Mark Dishaw and Chad Miller utilized Spanish translators to communicate with residents at the house, immediately advising them that no one was under arrest. Deputies Dishaw and Miller sought to speak with Defendant outside the residence, but upon learning that Defendant used orthotics for walking as a result of being born with spina

1

bifida, they entered the residence and contacted Defendant in the living room. Defendant spoke with deputies in fluent English and the entirely of the contact was audio and video-recorded.

Deputy Dishaw immediately advised Defendant, "You are not under arrest, OK? No one is going anywhere, or anything like that, but obviously we just need to talk to you real quick." (10:42). Deputy Dishaw asked, "Are you comfortable walking out to our vehicle, or would you rather stay inside?" (10:50). Defendant said, "I'm good here." (11:00). Deputy Dishaw asked if they could go to Defendant's bedroom and Defendant agreed. (11:06). Deputy Miller explained, "It's just a more private place, that's all." (11:10). Defendant's bedroom was very small and cluttered. Defendant sat on his bed during the conversation. Defendant was not handcuffed. The bedroom door was open. Deputy Miller and Deputy Dishaw were dressed casually in jeans and long-sleeve shirts, but had tactical vests on identifying themselves as law enforcement. Neither deputy ever displayed a firearm at any point during the interview. As they began to have a conversation about Defendant's age and whether he was in school, Deputy Dishaw told Defendant, "Jose, just a reminder, you seriously are not under arrest. You're not going anywhere. You don't even have to talk to us. But your name came up in one of his [referring to Deputy Miller] investigations. And so he just wants to get your side of the story because we have one side right now as to maybe some things that are going on online . . . ." (12:32). Deputy Dishaw went on, "I know he's [referring to Deputy Miller] sitting right there in front of the doorway, but if you feel like you need to leave, or want to leave, or quit talking to us, just so you know, you do have that right to go, OK?" (13:02). Deputy Miller then asked, "You good with talking with us here a little bit so we can figure this out?" (13:14). And Defendant stated, "Yes."

Defendant indicated he did not know why the deputies were there to talk to him. Deputies Miller and Dishaw began by asking Defendant about his phone, which was in Defendant's room.

Defendant provided the PIN to unlock the phone. Defendant also provided his email address and indicated that he had three Instagram accounts. Defendant indicated that no one other than him had access to his phone or his online social media accounts. When asked for his Instagram account names, Defendant hesitated and said he could not remember. Deputy Miller teased Defendant about being a twenty-year-old guy who could not remember his social media account. Defendant did not answer. Deputy Dishaw told Defendant, "I have a feeling you know exactly why we are here," but Defendant again denied knowing why. Deputy Dishaw noted that Defendant seemed particularly interested in Deputy Dishaw having possession of Defendant's phone. Deputy Dishaw encouraged Defendant to be honest and to speed up the interview by doing so. Deputy Dishaw reminded Defendant, "Like I said, no matter what you tell us today, unless you tell me you killed somebody, you are *not* under arrest. We seriously are just trying to figure out what's going on." (17:17). Deputy Miller added, "We are going to get information and we are going to leave…but we don't want to inconvenience your family any longer than we have to either." (17:25). The deputies continued to discuss Defendant's accounts and who had access to them. Defendant denied ever using Roblox or Likee. When the deputies provided the specific Instagram account name at issue, Defendant acknowledged that it was his account.

      Deputy Dishaw then advised Defendant that they wanted to talk to him about a conservation with a female on Instagram. Deputy Miller showed Defendant the minor victim. Defendant denied recalling a conversation with her. Deputy Miller explained how they had traced the conversation with Defendant's Instagram account to Defendant's phone and the WiFi at the residence. Deputy Miller described the conversation that occurred on Instagram and told Defendant that they had a copy of the conversation and knew what happened, but were looking for an explanation as to why it happened. Defendant indicated that he recalled the conversation.

When asked if he understood why the deputies would be concerned that Defendant was having conversations like that with a ten-year-old, Defendant indicated that he did. When asked how often conversations like that one had occurred, Defendant initially just, "Just that one time." The deputy later asked if he were to go through all of the Defendant's Instagram conversations, how often Defendant was trying to get naked videos from girls and Defendant then indicated that he had stopped doing that kind of stuff and that he thought it had occurred less than ten times. Deputy Miller asked what Defendant did with the videos and Defendant said, "Nothing." Defendant indicated that he did not have any other electronics besides his phone. Defendant acknowledged using the same "Rock Paper Scissors" game strategy in other conversations with girls on Instagram. When asked what age range of girls Defendant sought to talk to online, Defendant indicated he was not sure. Deputy Miller noted that the girl in the conversation at issue was ten and asked if that was the age of girls that Defendant was interested in talking to. Defendant said, "I think so."

At approximately twenty minutes into the conversation (thirty-two minutes into the audio recording), Defendant was acting bored/disinterested in the conversation with Deputy Miller and Deputy Dishaw started talking to Defendant. Deputy Dishaw encouraged Defendant to be honest. Defendant acknowledged recognizing the problem with soliciting nude videos from a ten-year-old girl. Defendant denied ever being hands-on with a minor. Deputy Dishaw advised Defendant that the phone was going to be searched pursuant to the warrant and asked what they would find. Defendant acknowledged engaging in conversations with other girls but denied that he had received any pictures from other girls. Deputy Dishaw encouraged Defendant to seek help if he had an addiction to sex or an attraction to children. Defendant acknowledged sexual attraction to pre-teen girls. Defendant said he had told himself to stop and had been trying to stop since the

conversation at issue. Defendant acknowledged knowing that it "wasn't right." Defendant denied distributing the videos and indicated he could not remember if he had saved them. Defendant denied masturbating to the videos. Deputy Dishaw asked if Defendant had images of children saved within the "LockIt" application on his phone and Defendant initially indicated there would not be any such photos, but later said there would be videos. Defendant provided the swipe pattern needed to unlock the application. Deputies observed there were graphic files depicting minors saved within the application. Defendant gave permission for deputies to access his Mega account via the phone. Deputies observed folders with girls' names and Defendant indicated which of the folders would contain nude images. Defendant gave permission for Deputy Dishaw to change the password to his Mega account. Defendant indicated that he had found the files in his Mega account on the internet and that they did not depict underage girls. Defendant acknowledged using Likee at one point but indicated that he remembered the conversation from February being only via Instagram. Defendant indicated that he had an old phone somewhere in the room that had been used for similar conduct.

  The interview lasted approximately one hour. The conversation was calm; at some points deputies took a parental tone—encouraging and being supportive to Defendant while also advising him that his conduct was problematic. Defendant said no to many of the deputies' questions and indicated that he did not know in response to many other questions. The questions were largely open-ended or simple yes/no questions, and the deputies were honest about the evidence that they had in their possession. Defendant was not arrested at the conclusion of the interview.

  Investigators later conducted forensic examinations of Defendant's phones and determined that both phones contained child pornography, including videos and images of

females aged approximately 2-12 years old performing sexual acts on adult males. The newer phone also included screen recordings of a chat with a different female child in which Defendant instructed the child to send a video of herself and the child responded by sending a video of her touching her naked vagina.

On May 20, 2021, a grand jury sitting in the District of Nebraska returned an indictment charging Defendant with two counts of sexual exploitation of children, one count of receipt of child pornography, and one count of possession of child pornography.

## Argument

**i. *Miranda* warnings were not required where Defendant was not in custody and a reasonable person in Defendant's position would have believed he was free to terminate the interview and leave.**

In *Miranda v. Arizona*, 384 U.S. 436 (1966), the United States Supreme Court set forth specific rights advisements to given before a "custodial interrogation." Law enforcement is not required to administer *Miranda* warnings to every person they question, even if the person being questioned is the suspect in a criminal investigation. *Oregon v. Mathiason*, 429 U.S. 492, 495 (1977). *Miranda* applies only where law enforcement questions a person who has been formally arrested or "where there has been such a restriction on a person's freedom as to render him 'in custody.'" *Id.* The determination of whether a suspect was in custody is an objective test based on the totality of the circumstances and it requires this Court to consider: first, the circumstances surrounding the interrogation; and next, given those circumstances, would a reasonable person have felt he was at liberty to terminate the interrogation and leave. *Thompson v. Keohane,* 516 U.S. 99, 112 (1995). Law enforcement is not required "to consider . . . contingent psychological factors when deciding when suspects should be advised of their *Miranda* rights." *Yarborough v.*

*Alvarado*, 541 U.S. 652, 668 (2004). The Eighth Circuit has identified a non-exhaustive list of indicia of custody:

> (1) whether the suspect was informed at the time of questioning that the questioning was voluntary, that the suspect was free to leave or request the officers to do so, or that the suspect was not considered under arrest; (2) whether the suspect possessed unrestrained freedom of movement during questioning; (3) whether the suspect initiated contact with authorities or voluntarily acquiesced to official requests to respond to questions; (4) whether strong arm tactics or deceptive stratagems were employed during questioning; (5) whether the atmosphere of the questioning was police dominated; or, (6) whether the suspect was placed under arrest at the termination of the questioning.

*United States v. Griffin*, 922 F.2d 1343, 1349 (8th Cir. 1990).

Factors 1, 2, and 6 clearly suggest a lack of custody in this case. Investigating deputies did not arrest Defendant on December 9, 2020. Defendant was repeatedly advised of the fact that he was not under arrest. Deputies wanted to speak with Defendant and told him as much, but they also advised Defendant that he did not have to talk to them. Because Defendant had physical disabilities that made walking outside difficult, the agents asked to speak with Defendant in his bedroom for privacy. Defendant agreed and went willingly to the room. Defendant was not handcuffed or otherwise restrained and the door to the room was open. Although the size of the room meant that a deputy was between Defendant and the bedroom door, Defendant was specifically told that he could leave at any point and that the deputy's position by the door should not make him think otherwise. The fact that Defendant was advised that he was free to go should be given significant weight in the custody analysis. *See Griffin*, 922 F.2d at 1349 ("The most obvious and effective means of demonstrating that a suspect has not been taken into custody or otherwise deprived of freedom of action, is for the police to inform the suspect that an arrest is not being made and that the suspect may terminate the interview at will. Where a suspect has been so advised, custody has frequently been found to not exist." (internal quotation marks and citation omitted)); *see also United States v. Jones,* 630 F.2d 613,

616 (8th Cir. 1980) ("The absence of a formal arrest and the advice of freedom to decline to answer, while not conclusive, are indicative of noncustodial interrogation."); *United States v. Czichray*, 378 F.3d 822, 826 (8th Cir. 2004) ("We believe that this abundant advice of freedom to terminate the encounter should not be treated merely as one equal factor in a multi-factor balancing test designed to discern whether a reasonable person would have understood himself to be in custody. That a person is told repeatedly that he is free to terminate an interview is powerful evidence that a reasonable person would have understood that he was free to terminate the interview. So powerful, indeed, that no governing precedent of the Supreme Court or this court, or any case from another court of appeals that can be located (save one decision of the Ninth Circuit decided under an outmoded standard of review) holds that a person was in custody after being clearly advised of his freedom to leave or terminate questioning." (internal citation omitted)). At no point during the interview in this case did Defendant indicate any desire to end the interview or leave the room.

      The interview was initiated by law enforcement (Factor 3), but no significant strong-arm tactics or deception was used (Factor 4). Law enforcement only encouraged Defendant to tell the truth and presented him with the evidence that they had already obtained regarding his conduct.

      As to Factor 5, the Government asserts that the atmosphere of the interview was not police dominated. Defendant suggests in his brief that officers executing the search warrant were displaying firearms and wearing bullet-proof vests and helmets, but this does not describe the atmosphere of the *interview*; this, at most, describes officers' initial entry into the residence. The interview of Defendant took place in a separate part of the residence, away from execution of the search warrant. The evidence in this case shows that the two deputies who spoke to Defendant were dressed casually, wearing jeans and long-sleeve shirts, with only tactical vests and badges

to identify themselves as law enforcement. Neither of the interviewing deputies displayed a firearm. While it is true that deputies arranged to conduct the interview of Defendant away from his parents and female siblings, the subject of this interview was one that very few would prefer to do in the presence of their parents and siblings and at no point did Defendant seek to consult with his family during the interview.

The totality of the circumstances demonstrates that Defendant was not in custody and a reasonable person in Defendant's situation would not have understood himself to be in custody. For these reasons, *Miranda* warnings were not required and the deputies did not violate Defendant's rights by failing to provide them.

### ii. Defendant's statements to investigators were voluntarily given.

When a statement is challenged, the Government bears the burden of proving by a preponderance of the evidence that a statement to law enforcement was voluntary. *United States v. LeBrun*, 363 F.3d 715, 724 (8th Cir. 2004). "A statement is involuntary when it was extracted by threats, violence, or express or implied promises sufficient to overbear the defendant's will and critically impair his capacity for self-determination." *United States v. LeBrun*, 363 F.3d 715, 714 (8th Cir. 2004) (quoting *Simmons v. Bowersox*, 235 F.3d 1124, 1132 (8th Cir. 2001)). Whether a defendant's will was overborne is determined by "examining the totality of the circumstances, including both the conduct of law enforcement in exerting pressure to confess on the defendant and the defendant's ability to resist that pressure." *United States v. Brave Heart*, 397 F.3d 1035, 1040 (8th Cir. 2005). Factors to be considered include "the degree of police coercion, the length of the interrogation, its location, its continuity, and the defendant's maturity, education, physical condition, and mental condition." *United States v. Boslau*, 632 F.3d 422, 428 (8th Cir. 2011) (quotation omitted). "Tactics, including claiming not to believe a suspect's

explanations, making false promises, playing on a suspect's emotions, using his respect for his family against him, deceiving the suspect, conveying sympathy, and even using raised voices, do not render a confession involuntary unless the overall impact of the interrogation caused the defendant's will to be overborne." *United States v. Magallon*, 984 F.3d 1263, 1284 (8th Cir. 2021) (quoting *Brave Heart*, 397 F.3d at 1041) (internal quotation marks omitted).

Defendant's statements to investigating deputies in this case were voluntarily given. The interviewing deputies did not raise their voices or subject Defendant to any physical punishment. Although the deputies urged Defendant to be honest and suggested that a fast interview would be less inconvenient to Defendant's family, any pressure exerted on Defendant was very mild and it was apparent throughout the interview that Defendant was capable of considering and deciding whether he wanted to answer the deputies' questions and to what extent. Most of the deputies' questions were not especially leading, but even where the questions might be characterized as leading, Defendant rarely agreed to the facts suggested by deputies.

Although advised that Defendant suffered from physical disabilities associated with spina bifida, deputies were never advised Defendant suffered from any mental disabilities and none are commonly associated with spina bifida. Defendant did not display any intellectual deficient during the interview. Defendant's answers were logical and understandable, and Defendant demonstrated enough understanding of the situation to minimize his conduct, largely only admitting what deputies appeared to already know had occurred. Although Defendant is a young adult and may have been relatively inexperienced with law enforcement, the totality of evidence demonstrates that his will was not overborn where deputies interviewed him for approximately one hour in his bedroom after repeatedly advising him that he was free to choose not to talk to them. *See United States v. Astello*, 241 F.3d 965, 968 (8th Cir. 2001) (concluding that confession

of an eighteen-year-old was voluntary where he had completed eleventh grade and possessed a capacity to understand what was being said during the interview).

## Conclusion

For the reasons stated above, the Government respectfully requests that this Court overrule Defendant's Motion to Suppress in its entirety.

Dated this 25th day of October, 2021.

        UNITED STATES OF AMERICA, Plaintiff

        JAN W. SHARP
        Acting United States Attorney
        District of Nebraska

By:    s/ Kelli L. Ceraolo
        KELLI L. CERAOLO, MN #0398049
        Assistant U.S. Attorney
        1620 Dodge Street, Ste. 1400
        Omaha, Nebraska 68102
        Tel: (402) 661-3700
        Fax: (402) 661-3084
        E-mail: kelli.ceraolo@usdoj.gov

## CERTIFICATE OF SERVICE

I hereby certify that on October 25, 2021, I electronically filed the foregoing with the Clerk of the Court using the CM/ECF system which sent notification of such filing to all registered participants. I also hereby certify that a copy of the same was served by regular mail, postage prepaid, to the following non-CM/ECF participants: N/A.

        s/ Kelli L. Ceraolo
        Assistant U.S. Attorney