IN THE UNITED STATES DISTRICT COURT
FOR THE DISTRICT OF NEBRASKA

| | |
|---|---|
| UNITED STATES OF AMERICA, | |
| Plaintiff, | 8:21CR152 |
| vs. | |
| JOSE RAMON CISNEROS PEREZ, | FINDINGS AND RECOMMENDATION |
| Defendant. | |

This matter is before the Court on Defendant's Motion to Suppress and Request for Evidentiary Hearing ([Filing No. 29](#)). An evidentiary hearing was held on the matter on January 7, 2022. A transcript has been filed and this matter is ripe for disposition.

For the reasons explained below, the undersigned will recommend that the motion be denied.

### FACTS

Deputy Chad Miller ("Deputy Miller") testified at the evidentiary hearing in this case. Deputy Miller is a deputy with the Douglas County Sheriff's Office and is assigned to the FBI Child Exploitation and Human Trafficking Task Force. (TR. 4-5.) Deputy Miller has been employed in law enforcement for about fifteen years and has been with the task force for four or five years. (TR. 5.) As a task force officer, Deputy Miller investigates child exploitation and child sex trafficking. (TR. 5.)

Deputy Miller testified that in June or July of 2020, he received a case from the exploitation task force in Kansas City regarding a ten-year-old child who had been communicating with

someone online who was exploiting her. (TR. 5.) As part of his investigation, Deputy Miller sent legal process to internet companies and determined the IP address connected to the online activity was associated with Defendant's residence. (TR. 6.) Deputy Miller's investigation revealed that there was likely more than one individual who resided at the address, but Deputy Miller concluded through his investigation that Defendant was the likely suspect. (TR. 6.)

Deputy Miller obtained a federal knock-and-announce search warrant for Defendant's residence in December, 2020. (TR. 6-7.) (TR. 7.) Deputy Miller testified that prior to going to Defendant's residence, he did a record check to determine whether any occupants of the house had criminal records. (TR. 19.) Deputy Miller stated he did not find anything indicating Defendant had a criminal record. (TR. 19.) At approximately 6:30 a.m. on December 9, 2020, approximately thirteen officers went to Defendant's residence to execute the search warrant. (TR. 7.) When they got to the residence, the officers knocked on the door and announced they had a search warrant. (TR. 13; Ex. 1.) The officers directed the individuals inside the residence to open the door. (TR. 13; Ex. 1.) Deputy Miller testified that a Spanish translator was present communicating in Spanish and English and announcing the officers' presence. (TR. 8-9; Ex. 1.) Deputy Miller testified that the officers knocked on the door of the residence for approximately two-minutes before forcing open the door. (TR. 7-8, TR. 14.)

Deputy Miller testified that four or five officers initially entered the residence. (TR. 14.) Deputy Miller stated that these "entry team" officers would have had firearms and safety protection and it was possible these officers displayed their firearms as they entered the home. (TR. 8, TR. 14.) Deputy Miller testified he did not know if the individuals inside the residence were directed to get on the floor by the officers. (TR. 14.) Deputy Miller stated that when he entered the residence, the occupants of the residence were secured. (TR. 15.) Deputy Miller could not recall if the occupants were handcuffed or just sitting on the couch. (TR. 15.) Deputy Miller testified that the occupants had their freedom of movement restricted and were not free to move about until the house was secured and officers knew who was in the house. (TR. 15.)

Deputy Mark Dishaw ("Deputy Dishaw"), who was present at the time the warrant was executed, also testified at the evidentiary hearing in this matter. (TR. 25-26.) Deputy Dishaw is an investigator with the Douglas County Sheriff's Office and is currently assigned to the FBI Child

Exploitation Task Force. (TR. 25.) Deputy Dishaw has been with the Sheriff's Office for approximately nineteen years and has been on the task force for around eleven years. (TR. 25.)

Deputy Dishaw testified that when he entered the residence, he told everyone that they were not under arrest. (TR. 26; Ex. 1.) Deputy Miller and Deputy Dishaw made contact with Defendant who was in the living room of the residence. (TR. 15, TR. 26.) Deputy Miller testified Defendant was not handcuffed and was seated in a chair. (TR. 16.) Deputy Dishaw advised Defendant he was not under arrest but that he needed to speak to him. (TR. 26; Ex. 1.) Deputy Dishaw asked Defendant if he would like to speak in a police cruiser or if he preferred to stay inside the residence. (TR. 26-27; Ex. 1.) Defendant indicated he wanted to stay in the residence. (TR. 27; Ex. 1.) Deputy Dishaw asked if he could speak to Defendant in his bedroom because it was a more private area and Defendant agreed. (TR. 9, TR. 20, TR. 27; Ex. 1.) Miller and Deputy Dishaw then went with Defendant to his bedroom, which was in the basement of the residence. (TR. 9, TR. 20, TR. 27; Ex. 1.) Deputy Dishaw testified he was aware Defendant had spina bifida and mobility issues, but Defendant was able to walk to the basement unassisted for the interview. (TR. 18, TR. 23.) Deputy Miller and Deputy Dishaw testified that Defendant appeared to speak and understand English fluently. (TR. 9, TR. 28.) Deputy Miller testified Defendant was not placed under arrest before the interview and at no time was Defendant provided his *Miranda* warnings. (TR. 10, TR. 16.)

During the interview, Deputy Miller was positioned by the doorway of the bedroom—between Defendant and the door. (TR. 17, TR. 23, TR. 29; Ex. 2.) Deputy Miller testified that the bedroom was small and this was the only place he could sit. (TR. 23.) Defendant was seated on his bed and Deputy Dishaw was positioned on Defendant's left. (TR. 18; Ex. 2.) The bedroom door was open and Defendant was not handcuffed. (TR. 10, TR. 29; Ex. 2.) Deputy Dishaw reminded Defendant he was not under arrest and did not have to talk to the officers. (TR. 28-29; Exs. 1, 2.) Deputy Dishaw explained to Defendant that his name came up in one of Deputy Miller's investigations and Deputy Miller wanted to get Defendant's side of the story about things the investigation revealed about online activity. (Exs. 1, 2.) Deputy Dishaw further told Defendant that even though Deputy Miller was sitting in front of the doorway of the bedroom, Defendant could leave or quit talking to them. (Exs. 1, 2.) Deputy Dishaw then asked Defendant if he was willing to speak to them and Defendant agreed. (Exs. 1, 2.) The officers thereafter engaged

3

Defendant in conversation and, during that conversation, Deputy Dishaw told Defendant that no matter what Defendant told them, he was not under arrest, as long as he does not say he killed someone, and that officers were going to leave after they got the information. (Exs. 1, 2.) Deputy Dishaw testified that at some point, Defendant told them he was twenty-one years old. (TR. 31.) At no time did Defendant indicate he wanted to end the interview or leave the room. (Exs. 1, 2.) The interview, which was video and audio recorded, lasted approximately one hour. (TR. 9-10; Exs. 1, 2.)

While Deputy Miller and Deputy Dishaw were speaking to Defendant in his bedroom, other officers were searching the residence. (TR. 12.) Deputy Miller estimated that besides himself and Deputy Dishaw, there were about five or six officers present in the home conducting the search. (TR. 12.) Those officers did not enter Defendant's bedroom while Defendant was being interviewed. (TR. 12; Ex. 2.)

Deputy Miller testified that he was dressed in plain-clothes, with a bullet resistant vest marked Douglas County Sheriff. (TR. 8.) Deputy Dishaw testified he was dressed in jeans, a sweatshirt, and was wearing a bulletproof vest that said sheriff on it. (TR. 27, TR. 32.) Deputy Miller and Deputy Dishaw testified they were armed during the interview but did not display or remove their firearms. (TR. 10, TR. 30.) They also testified that they did not raise their voices, make any threats or promises, make false statements, or touch Defendant during their interaction. (TR. 11, TR. 30-31.) They testified Defendant did not appear to have any difficulty understanding them and that Defendant's responses to questions made sense. (TR. 11, TR. 30.) Deputy Miller testified that Defendant was quiet and cooperative throughout the interview. (TR. 20.) Once the interview was over, they all returned upstairs to the main floor of the residence and Defendant was not arrested. (TR. 10, TR. 31.) Deputy Miller testified he knew Defendant had spina bifida and had mobility issues at the time of his interview, but that Defendant was able to walk to the basement unassisted for the interview and back up to the kitchen unassisted after the interview. (TR. 18, TR. 23, TR. 31.) Deputy Miller testified that officers left shortly after his conversation with Defendant. (TR. 12.)

## DISCUSSION

Defendant argues that statements he made to Deputy Miller and Deputy Dishaw on December 9, 2020 should be suppressed because he was not advised of his *Miranda* rights. *Miranda* warnings are required when a person is interrogated by law enforcement after being taken into custody. *United States v. Huether*, 673 F.3d 789, 794 (8th Cir. 2012) (quotation omitted). "Custody occurs either upon formal arrest or under any other circumstances where the suspect is deprived of his freedom of action in any significant way." *United States v. Griffin*, 922 F.2d 1343, 1349 (8th Cir. 1990). "To determine whether a defendant was in custody for *Miranda* purposes, a court looks to the totality of the circumstances confronting the defendant at the time of the interview, and asks whether a reasonable person in his position would consider his freedom of movement restricted to the degree associated with formal arrest." *Huether*, 673 F.3d at 794 (quotation omitted). "The inquiry is an objective one, without consideration of the participants' subjective views." *Id*. "The issue turns on whether a reasonable person in the suspect's shoes would have felt free to end the interview." *United States v. Roberts*, 975 F.3d 709, 716 (8th Cir. 2020).

Courts have found the following non-exhaustive factors relevant to the custody inquiry: (1) whether the suspect was informed that he was free to leave and that answering was voluntary; (2) whether the suspect possessed freedom of movement; (3) whether the suspect initiated contact or voluntarily acquiesced; (4) whether strong arm tactics or strategies were employed; (5) whether the atmosphere was police dominated; or (6) whether the suspect was placed under arrest at the end of questioning ("*Griffin* factors"). *United States v. Griffin*, 922 F.2d 1343, 1349 (8th Cir. 1990). Other considerations in determining custody may include the "purpose, place and length of the interrogation." *Id*. The *Griffin* factors "are not by any means exclusive, and . . . 'custody' cannot be resolved merely by counting up the number of factors on each side of the balance." *United States v. Czichray*, 378 F.3d 822, 827 (8th Cir. 2004).

The totality of the circumstances show that Defendant was not in custody at the time he was interviewed. Defendant was told multiple times he was not under arrest and did not have to speak to the officers. *See Griffin*, 922 F.2d at 1349 ("The most obvious and effective means of demonstrating that a suspect has not been taken into custody or otherwise deprived of freedom of action, is for the police to inform the suspect that an arrest is not being made and that the suspect may terminate the interview at will. Where a suspect has been so advised, custody has frequently

5

been found to not exist.") (internal quotation marks and citation omitted). Defendant agreed to speak to officers and did not indicate he wanted to terminate the interview at any point.

Moreover, Defendant's freedom of movement was not restricted during the interview. Defendant was not handcuffed and was seated in his bedroom. Although the bedroom was small and Deputy Miller was between Defendant and the doorway, Defendant was told that this circumstance was not meant to prevent him from leaving the room and that he could stop talking to them and leave the room at any time. Defendant did not ever indicate he wanted to leave the room.

Also, there is no indication that strong arm tactics or strategies were employed or that the atmosphere was so police dominated that Defendant would consider himself in custody. The interview was conversational in nature and Defendant was cooperative. Officers told Defendant why they were there and what they wanted to talk to him about. They also told Defendant they were going to leave after they got information and that Defendant was not going to be arrested that day no matter what he said. This was true. Officers left shortly following their conversation and Defendant was not arrested. Although there were multiple officers in the residence, there were only two officers present during the interview, which occurred in Defendant's residence per Defendant's request. Those officers were dressed in plain-clothes, did not brandish their weapons, spoke in a conversational manner, and did not threaten Defendant in any way. A reasonable person in Defendant's situation would not have understood himself to be in custody. Because Defendant was not in custody at the time of the interview, his *Miranda* rights were not violated.

Defendant also contends the statements he made were involuntary. "Statements to law enforcement authorities are voluntary if they are the product of an essentially free and unconstrained choice by their maker. A statement is not considered involuntary unless the police extorted it from the accused by means of coercive activity." *United States v. Vinton*, 631 F.3d 476, 482 (8th Cir. 2011) (internal quotations and citations omitted). "The appropriate test for determining whether a statement or confession is voluntary is whether the alleged statement or confession was extracted by threats, violence, or direct or indirect promises, such that [an individual's] will [was] overborne and his . . . capacity for self-determination critically impaired." *United States v. Gipp*, 147 F.3d 680, 683 (8th Cir. 1998) (internal quotation omitted). In deciding whether a suspect's statements were made voluntarily, courts consider the totality of the

6

circumstances. *United States v. Estey*, 595 F.3d 836, 839 (8th Cir. 2010). Factors to be considered include "the degree of police coercion, the length of the interrogation, its location, its continuity, and the defendant's maturity, education, physical condition, and mental condition." *United States v. Boslau*, 632 F.3d 422, 428 (8th Cir. 2011) (quotation omitted).

Deputy Miller and Deputy Dishaw were dressed in plain-clothes and did not brandish their firearms. They did not raise their voices, make any threats, promises, false statements, or touch Defendant. Defendant was fluent in English and did not have difficulty understanding the officers. Defendant's responses to their questions made sense. Defendant had some mobility issues due to spina bifida, but Defendant did not appear to have any mental disabilities or other difficulties that impaired his ability to terminate questioning. Although Defendant was relatively young and inexperienced with law enforcement, he was repeatedly advised he was not under arrest and told he did not have to speak to the officers. The interview took place in Defendant's bedroom and was short in duration, lasting only about one hour. In short, there is no indication that Defendant's will was overborne or his capacity for self-determination impaired. The totality of the circumstances show that Defendant's statements were entirely voluntary. Therefore, the undersigned will recommend that Defendant's Motion to Suppress be denied.

Accordingly,

**IT IS HEREBY RECOMMENDED** to Chief United States District Court Judge Robert Rossiter, Jr. that Defendant's Motion to Suppress (Filing No. 29) be denied.

Dated this 1st day of March, 2022.

BY THE COURT:

s/ Susan M. Bazis
United States Magistrate Judge

**ADMONITION**

Pursuant to NECrimR 59.2, any objection to this Findings and Recommendation shall be filed within fourteen (14) days after being served with a copy of this Findings and Recommendation. Failure to timely object may constitute a waiver of any such objection. The brief in support of any objection shall be filed at the time of filing such objection. Failure to file a brief in support of any objection may be deemed an abandonment of the objection.